CLIFTON, Circuit Judge:
 

 First Alliance Mortgage Company was driven into bankruptcy and subsequent liquidation by well-publicized and justified allegations of fraudulent lending practices. The demise of First Alliance has led to two separate actions against Lehman Brothers, Inc. and its subsidiary Lehman Commercial Paper, Inc. (collectively referred to as “Lehman”) growing out of Lehman’s activity as a lender to First Alliance and as the underwriter of First Alliance’s securitized debt. One is a class action on behalf of First Alliance’s borrowers seeking to impose liability for aiding and abetting the fraudulent scheme engaged in by First Alliance. The other, brought by the bankruptcy trustee appointed to liquidate First Alliance, seeks to set aside payments Lehman received in the course of its financing relationship with First Alliance and to subordinate Lehman’s secured claims in the First Alliance bankruptcy in favor of the claims of First Alliance’s unsecured creditors. (This group of unsecured creditors is essentially the same as the group of borrowers asserting their claims of fraud against First Alliance, as is explained in more detail below.
 
 See infra
 
 at 985.) These two separate actions were handled together by the same district court and have been consolidated for purposes of this appeal.
 

 After a trial, a jury found Lehman liable under California tort law to the class of borrowers for aiding and abetting fraud, and the district court entered judgment accordingly. As to the trustee’s action, the district judge concluded that Lehman’s conduct pursuant to its relationship with First Alliance did not warrant relief under the equitable principles of bankruptcy law.
 
 *984
 

 See Austin v. Chisick (In re First Alliance Mortgage Co.),
 
 298 B.R. 652 (C.D.Cal.2008) (setting forth the district court’s findings of fact and conclusions of law). We now affirm these holdings, as we do the district court’s rejection of several other claims related to these actions. We reverse the district court’s denial of remittitur or new trial as to the jury’s damages calculation, however, and we remand for further proceedings based on the proper theory of fraud damages.
 

 I. BACKGROUND
 

 In order to explicate the relationships among First Alliance and the parties to this case — the Austin Class Plaintiffs (“Borrowers”), Liquidating Trustee Kenneth Henry (“Trustee”), and Lehman — and the context out of which their claims arise, we begin with a brief background of the factual and procedural history of the disputes now before us.
 

 A. First Alliance Mortgage Company
 

 First Alliance was a lender in the “sub-prime” mortgage sector. Subprime lending is a relatively new and rapidly growing segment of the mortgage market which generally consists of borrowers who, for a variety of reasons, might otherwise be denied credit. A typical borrower in the subprime mortgage market is “house-rich” but “cash-poor,” having built up equity in his home but in little else, and has a lower net income than the average borrower. Subprime lenders generally charge somewhat higher interest rates to account for the increased risk associated with these loans. As the subprime home mortgage industry has grown over the last decade, increasing attention has focused on predatory lending abuses — the practice of making loans containing interest rates, fees or closing costs that are higher than they should be in light of the borrower’s credit and net income, or containing other exploitative terms that the borrower does not comprehend.
 
 [1]
 

 See
 
 Debra Pogrund Stark,
 
 Unmasking the Predatory Loan in Sheep’s Clothing: A Legislative Proposal,
 
 21 Harv. BlackLetter L.J. 129, 130 (2005) (noting the “unresolved and heated debate between consumer advocates and lenders over how to curb the activities of predatory mortgage brokers and lenders without adversely affecting the robust legitimate sub-prime market”).
 

 As the district court explained in highly detailed findings of fact (298 B.R. at 655-65) upon which this summary is based, First Alliance originated, sold and serviced residential mortgage loans in the subprime market through a network of retail branches located throughout the country, utilizing a marketing methodology designed to target individuals who had built up substantial equity in their homes, many of whom were senior citizens. Through telemarketing efforts, First Alliance employees would set up appointments for
 
 *985
 
 what they described as in-house appraisals with targeted prospective borrowers. Following the appraisals, loan officers would employ a standardized sales presentation to persuade borrowers to take out loans with high interest rates and hidden high origination fees or “points” and other “junk” fees, of which the borrowers were largely unaware. The key to the fraud was that loan officers would point to the “amount financed” and represent it as the “loan amount,” disregarding other charges that increased the total amount borne by the borrowers.
 

 First Alliance trained its loan officers to follow a manual and script known as the “Track,” which was to be memorized verbatim by sales personnel and executed as taught. The Track manual did not instruct loan officers to offer a specific lie to borrowers, but the elaborate and detailed sales presentation prescribed by the manual was unquestionably designed to obfuscate points, fees, interest rate, and the true principal amount of the loan. First Alliance’s loan officers were taught to present the state and federal disclosure documents in a misleading manner, and the presentation was so well performed that at least some borrowers had no idea they were being charged points and other fees and costs averaging 11 percent above the amount they thought they had agreed to. Loan officers were taught to deflect attention away from things that consumers might normally look at, and the loan sales presentation was conducted in such a way as to lead a consumer to disregard the high annual percentage rate (“APR”) when it was ultimately disclosed on the federally-required Truth in Lending Statement.
 

 In the late 1990’s, First Alliance became subject to increasing scrutiny including allegations that the borrowers’ loans were fraudulently induced and that First Alliance deceived borrowers into paying large loan origination fees of which they were unaware. In 1998 the United States Department of Justice and the attorneys general for seven states initiated a joint investigation into First Alliance’s lending practices. A lawsuit making similar claims was filed in December 1998 by AARP (American Association of Retired Persons). Two California Courts of Appeal held that First Alliance loan agreements containing arbitration clauses were unenforceable because they had been entered into based on the fraudulent practices of loan officers.
 
 See
 
 298 B.R. at. 658-59 (chronicling First Alliance’s lengthy litigation history).
 

 In March 2000, the
 
 New York Times
 
 published a front-page article highly critical of First Alliance’s loan origination procedures. The article implicated Wall Street investment banking firms, concentrating on Lehman’s role in funding First Alliance. Days later, the ABC News program
 
 “20/20”
 
 aired a companion segment which focused further negative attention on First Alliance. Later that month First Alliance filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, because of the costs associated with the growing number of lawsuits against it and the negative national publicity it was facing.
 

 In June of 2000, the U.S. Trustee appointed a Borrowers Committee pursuant to an order of the bankruptcy court, in accordance with Section 1102(a)(1) of the Bankruptcy Code. The Committee was appointed to represent the interests of individual consumer borrowers who had claims against First Alliance and against Lehman in the adversary bankruptcy proceedings. In September 2002, the district court entered an order confirming a liquidation plan for the company and appointed Kenneth Henry as the Liquidating Trustee of the First Alliance estate and successor in
 
 *986
 
 interest to the Committee. The group of unsecured creditors represented by the Trustee consists mostly of the same consumer borrowers represented by the plaintiff class.
 

 In September 2002, the district court also approved a settlement in an action brought by the Federal Trade Commission (“FTC”) against First Alliance for violations of federal lending laws. In exchange for the amount to be paid out to a redress fund administered by the FTC, First Alliance was discharged of further liability, such that the settlement had the effect of ending all litigation against First Alliance. Lehman was not a party to that settlement, but as will be discussed below,
 
 infra
 
 at 1002-06, the terms of the settlement affected the amount of damages for which Lehman was held liable to the Borrower class.
 

 B. Lehman’s Relationship with First Alliance
 

 First Alliance’s business model was to originate mortgages to consumer borrowers and then pledge them to a secondary lender such as an investment bank or other financial institution in return for a loan under a revolving line of credit. As First Alliance generated mortgages, it would draw down on that line of credit to fund the mortgages until it had funded approximately $100 million in loans. When its loan volume reached that point, First Alliance would issue bonds or notes to public investors that were secured by the repayment stream from the mortgage loans. The securitization process would be underwritten by the investment bank, and First Alliance would simultaneously repay the credit line with part of the proceeds from the sales of the bonds and notes. When First Alliance repaid its credit line, the investment bank released its lien.
 

 Under this revolving credit system, the secondary lender provided both the credit facility, which First Alliance used to fund the consumer mortgage loans, and underwriting services for First Alliance’s public equity asset-backed securitizations. The securitization process made possible a constant flow of money to First Alliance, whereby the mortgage company was able to convert a long-term revenue stream from the repayment of the mortgage loans to current income and to capital with which to fund more loans. Meanwhile, the secondary lender profited from interest and fees as the credit line was repaid as well as from fees earned for underwriting the securitizations.
 

 Throughout the 1990’s, First Alliance was financed by a number of warehouse lenders, including other large financial firms similar to Lehman. Lehman was interested in obtaining some or all of that business. In contemplation of doing business with First Alliance, Lehman conducted an inquiry into the company in 1995. Lehman’s investigation revealed that First Alliance had been accused of fraudulent lending practices since at least 1994 and was the subject of more litigation than any other non-bankrupt firm in the sector. Internal reports contained unfavorable descriptions of First Alliance’s business practices, including references to unethical practices and a disturbing record of loans generated to senior citizens. Nevertheless, in 1996 Lehman agreed to extend First Alliance a $25 million warehouse line of credit. During 1996 and 1997, Lehman co-managed four asset-backed securitization transactions for First Alliance.
 

 The mounting scrutiny and litigation against First Alliance caused alarm among some of its other lenders. By the end of 1998, First Alliance’s other main lenders had withdrawn all funding, due in part to the potential liability facing First Alliance.
 
 *987
 
 When these other lenders withdrew financing, Lehman stepped forward to provide a $150 million credit line and became First Alliance’s sole source of warehouse funding and underwriting.
 

 The Lehman credit facility was renewed in 1999. According to the terms of their agreement, Lehman made secured loans to First Alliance by advancing 95 percent of the value of the mortgages First Alliance pledged as collateral. The agreement required First Alliance to provide quarterly financial statements, as well as to provide certification that it was in compliance with the terms and conditions of the agreement during the relevant period. First Alliance kept Lehman informed of its pending litigation, and from time to time during 1999 and 2000, Lehman retained the Clayton Group, a company that specialized in analyzing loans in order to determine compliance with regulations, to examine loans generated by First Alliance.
 

 Between 1998 and 2000, First Alliance borrowed roughly $500 million from Lehman pursuant to its warehouse line of credit. When First Alliance declared bankruptcy in 2000, approximately $77 million borrowed from Lehman’s warehouse credit line remained outstanding, secured by First Alliance mortgages. During the course of the bankruptcy proceedings, Lehman was paid this principal amount plus interest — payments the Trustee claims on appeal were made in error.
 

 C. The Consolidated Actions
 

 Two separate but largely overlapping actions that were consolidated by the district court are the subject of this appeal: a tort action brought by a class of First Alliance Borrowers and a bankruptcy action brought by the liquidating Trustee of the First Alliance estate.
 

 The district court certified a class consisting of all persons who had obtained First Alliance mortgage loans from May 1, 1996, through March 31, 2000, which were used as collateral for First Alliance’s warehouse credit line with Lehman or were securitized in transactions underwritten by Lehman. The Borrowers obtained class certification on the basis that First Alliance had allegedly engaged in a uniform and systematic fraud against those who made up the class, and that Lehman was liable to them for aiding and abetting this fraud under California tort law and under California’s Unfair Competition Law (“UCL”), Cal. Bus. & Prof.Code § 17200. The basis of Lehman’s liability under the tort and UCL claims was that when Lehman agreed to provide the financing for First Alliance’s mortgage business, Lehman did so knowing that First Alliance loans were originated through deceptive sales procedures, and that without Lehman’s financing, First Alliance would not have been able to continue to fund its fraudulently obtained loans.
 

 The Trustee’s action sought to subordinate, for purposes of bankruptcy distribution and based upon equitable principles, Lehman’s $77 million secured claim to the liquidated assets of the estate to the claims of First Alliance’s general unsecured creditors harmed by its fraudulent business practices. The Trustee’s action also sought to recover about $400 million that had previously been paid to Lehman pursuant to the financing agreement, which was characterized as part of First Alliance’s fraud on its consumer borrowers.
 

 The district court consolidated the adversary bankruptcy proceeding against Lehman with the proposed class action. The remedies sought by the Trustee and the legal theories upon which they are based are somewhat distinct from those aspects of the Borrowers’ fraud claim, but the two actions against Lehman overlap in
 
 *988
 
 important ways. The parties in interest represented by the Trustee in the bankruptcy action include over 4,000 individual consumer borrowers allegedly defrauded by First Alliance — a group that includes the Borrowers who make up the class of plaintiffs in the fraud action. Both actions rest on the premise that Lehman’s financial relationship with First Alliance was a component of First Alliance’s fraudulent scheme. The same fraudulent enterprise that the Borrowers claim tainted Lehman’s secondary lending to First Alliance is what both the Borrowers and the Trustee claim compels subordination of Lehman’s bankruptcy claims and rescission of payments made to Lehman pursuant to the financing agreement.
 

 The Borrowers’ aiding and abetting claims against Lehman were tried to a jury. As reported in its special verdict form, the jury found that First Alliance had systematically committed fraud on the class of Borrowers using a standardized sales presentation, and that Lehman was liable under California law for aiding and abetting First Alliance in a fraudulent lending scheme. Applying the terms of the previously approved settlement between First Alliance and the FTC (discussed in more detail below,
 
 see infra
 
 section II.G at 1002-06), the court asked the jury to calculate the total damages for the Borrowers and to determine the percentage of that total for which Lehman was responsible. The jury calculated the total damages award to be $50,913,928 and determined that Lehman was responsible for 10 percent of that amount. Accordingly, the court entered a judgment against Lehman for $5,091,392.80. This damages award did not include punitive damages or damages under the UCL, as the district court had granted Lehman’s motions for summary judgment on those claims prior to the jury trial.
 

 Lehman appeals the judgment on several grounds. Lehman argues that the Borrowers did not prove systematic fraud on a class-wide basis, and further that the jury was improperly instructed on the elements of aiding and abetting fraud, which Lehman claims requires a finding of specific intent. Lehman also takes issue with two evidentiary rulings made during trial, which Lehman insists caused prejudice and necessitate a new trial. In addition, Lehman challenges the damages calculation, arguing that it was based on an improper theory of damages and that the jury was erroneously instructed.
 

 The Borrowers cross-appeal, finding fault with the court’s apportionment of damages based on the percentage of liability. The apportionment of damages was made pursuant to the “judgment reduction” clause or “Bar Order” in the previously-approved settlement agreement between the plaintiffs
 
 [2]
 
 and First Alliance, which extinguished all non-settling defendants’ rights to indemnity or contribution from First Alliance (discussed fully below,
 
 see infra
 
 section II.G at 1002-06). The Borrowers claim that this settlement agreement did not apply to their aiding and abetting action against Lehman. The Borrowers also appeal the court’s summary judgment order on their UCL and punitive damages claims.
 

 The Trustee’s equitable subordination and fraudulent transfer claims were tried to the bench, and the district court denied
 
 *989
 
 those claims. The court made findings of fact that echoed the jury’s determination that Lehman’s conduct amounted to aiding and abetting fraud, but it concluded that equitable subordination and fraudulent transfer rescission were not appropriate remedies. 298 B.R. at 665-70. Regarding the Trustee’s claim for equitable subordination, the court found that Lehman’s conduct did not deplete or otherwise adversely impact First Alliance’s assets, was not related to the acquisition or assertion of its secured claim against the First Alliance estate, and did not amount to gross or egregious misconduct that shocks the conscience of the court. Likewise, the court found that First Alliance’s payments to Lehman were not fraudulent transfers under California law and the Bankruptcy Code.
 
 Id.
 
 The Trustee appeals both of these holdings.
 

 We consider these issues in turn below, and our conclusions may be briefly summarized as follows. Sufficient evidence supported the allegation that First Alliance committed fraud on a class-wide basis through a common course of conduct, so class treatment of the Borrowers’ claims against Lehman was proper. Aiding and abetting fraud under California law requires a finding of “actual knowledge” and “substantial assistance.” There was sufficient evidence of such knowledge and assistance to support the jury’s verdict against Lehman. The district court properly denied relief on Borrowers’ claims against Lehman under California’s UCL, because the equitable remedies available under that statute were not appropriate here. The district court properly concluded that punitive damages against Lehman were not warranted because the record did not support a finding of intent or otherwise “despicable” conduct on the part of Lehman required to justify such an award. No erroneous evidentiary rulings prejudiced Lehman such that a new trial is needed. Equitable subordination of Lehman’s claims to the First Alliance bankruptcy proceedings was not an appropriate remedy, nor was setting aside payments made to Lehman as fraudulent transfers warranted. We therefore affirm all of the district court’s orders with respect to these issues on appeal.
 

 We agree with Lehman, however, that the damages calculation by the jury was based in part on an incorrect “benefit of the bargain” theory of damages and must be set aside to allow for a proper calculation of “out of pocket” damages apportioned based on responsibility, according to the terms of the settlement agreement. Therefore, the denial of Lehman’s motion for remittitur or a new trial to recalculate damages was error. On that claim, we reverse and remand for further proceedings.
 

 II. DISCUSSION
 

 A. Class Treatment
 

 Lehman’s attack on the judgment begins with the predicate finding that the Borrowers were victims of a class-wide fraud perpetrated by First Alliance. According to Lehman, it was error for the district court to certify the class of borrowers in the first place and further error to deny Lehman’s motions for judgment as a matter of law and for a new trial on the grounds that the Borrowers failed to prove fraud on a class-wide basis during trial. Lehman’s contention that the Borrowers failed to prove fraud on a class-wide basis raises questions of law and fact: what degree of commonality must exist among the misrepresentations made to borrowers to support class treatment in federal court and a class-wide finding of fraud under California law are matters of law; whether such similar misrepresentations were in fact made by First Alliance and justifiably
 
 *990
 
 relied upon by borrowers on a class-wide basis are factual determinations. We address each question in turn.
 

 1. Degree of uniformity among misrepresentations: common course of conduct standard
 

 The required degree of uniformity among misrepresentations in a class action for fraud is a question of law which we review
 
 de novo. See Torres-Lopez v. May,
 
 111 F.3d 633, 638 (9th Cir.1997). Lehman argues that for the fraud claim to have been properly tried on a class basis, the Borrowers were required to demonstrate that First Alliance’s alleged misrepresentations were conveyed to borrowers in a uniform manner and that the uniform misrepresentations came directly from the written, standardized sales pitch. According to Lehman, the Borrowers’ failure to make these showings prior to class certification or during trial made class treatment inappropriate in the first place and the class-wide verdict erroneous as a matter of law. Lehman essentially asks us to hold that in order for the jury finding to stand, the misrepresentation at the heart of the class-wide fraud finding must have been a direct quote from the “Track,” repeated in a verbatim fashion to each member of the class. This we decline to do, for such a degree of commonality is not required.
 

 The familiar federal rule for class certification requires that “there are questions of law or fact common to the class.” Fed.R.Civ.P. 23(a)(2). When the modern class action rule was adopted, it was made clear that “common” did not require complete congruence. The Advisory Committee on Rule 23 considered the function of the class action mechanism in the context of a fraud ease and explained that while a case may be unsuited for class treatment “if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed,” a “fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action .... ” Fed.R.Civ.P. 23, Advisory Committee Notes to 1966 Amendments, Subdivision (b)(3);
 
 see also
 
 39 F.R.D. 69, 103 (1966). While some other courts have adopted somewhat different standards in identifying the degree of factual commonality required in the misrepresentations to class members in order to hold a defendant liable for class-wide fraud,
 
 [3]
 
 this court has followed an approach that favors class treatment of fraud claims stemming from a “common course of conduct.”
 
 See Blackie v. Barrack,
 
 524 F.2d 891, 902 (9th Cir.1975) (“Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant’s course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members’ positions”);
 
 see also Harris v. Palm Springs Alpine Estates, Inc.,
 
 329 F.2d 909, 914 (9th Cir.1964).
 

 
 *991
 
 Class treatment has been permitted in fraud cases where, as in this case, a standardized sales pitch is employed. In
 
 In re American Continental Corp./Lincoln Savings & Loan Securities Litigation,
 
 140 F.R.D. 425 (D.Ariz.1992), the court correctly rejected a “talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations, unless those representations are all but identical,” observing that such a strict standard overlooks the design and intent of Rule 23.
 
 Id.
 
 at 430.
 
 Lincoln Savings
 
 involved a scheme that included, among other things, the sale of debentures to individual investors who relied on oral representations of bond salespersons who in turn had received from defendants fraudulent information about the value of the bonds. The
 
 Lincoln Savings
 
 court focused on the evidence of a “centrally orchestrated strategy” in finding that the “center of gravity of the fraud transcends the specific details of oral communications.”
 
 Id.
 
 at 430-31. As the court explained:
 

 [T]he gravamen of the alleged fraud is not limited to the specific misrepresentations made to bond purchasers.... The exact wording of the oral misrepresentations, therefore, is not the predominant issue. It is the underlying scheme which demands attention. Each plaintiff is similarly situated with respect to it, and it would be folly to force each bond purchaser to prove the nucleus of the alleged fraud again and again.
 

 Id.
 
 at 431;
 
 see also Schaefer v. Overland Express Family of Funds,
 
 169 F.R.D. 124, 129 (S.D.Cal.1996) (citing
 
 Lincoln Savings
 
 for the proposition that representations made to brokers or salesmen which are intended to be communicated to investors are sufficient to warrant class standing, even where the actual representations to individuals varied). The Borrowers’ allegations of First Alliance’s fraud fit comfortably within the standard for class treatment.
 

 2. The class-wide fraud finding is supported by the evidence
 

 Turning to the factual findings made by the jury, we review a denial of a motion for judgment as a matter of law
 
 de novo, Hangarter v. Provident Life & Accident Ins. Co.,
 
 373 F.3d 998, 1005 (9th Cir.2004), and a district court’s denial of a motion for new trial for abuse of discretion.
 
 Navellier v. Sletten,
 
 262 F.3d 923, 948 (9th Cir.2001). Even under the
 
 de novo
 
 standard, the court must “draw all reasonable inferences in favor of the non-moving party, keeping in mind that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.”
 
 Hangarter,
 
 373 F.3d at 1005 (internal quotation marks and citations omitted). Judgment as a matter of law should be granted only if the verdict is “against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result.”
 
 Id.
 
 (internal citations omitted). The jury concluded that First Alliance had committed systemic fraud on a class-wide basis, and the district judge did not find this conclusion to be erroneous.
 

 The evidence in this case supports the finding by the jury that there was, in fact, a centrally-orchestrated scheme to mislead borrowers through a standardized protocol the sales agents were carefully trained to perform, which resulted in a large class of borrowers entering into loan agreements they would not have entered had they known the true terms. We note in particular the standardized training program for sales agents, which included a script that was required to be memorized and strict adherence to a specific method of hiding information and misleading borrowers, dis
 
 *992
 
 cussed in the district court’s separate findings of fact at 298 B.R. at 656-58. The record shows, for instance, that loan officers were trained to misrepresent the monthly payment on the loan to make it appear lower than the borrower’s prior mortgage payment, and when asked about points, to falsely state that “all fees and costs have already been computed into your monthly payment,” and then to immediately redirect the borrower’s attention to another document. That First Alliance’s fraudulent system of inducing borrowers to agree to unconscionable loan terms did not consist of a specifically-worded false statement repeated to each and every borrower of the plaintiff class, traceable to a specific directive in the Track, does not make First Alliance immune to class-wide accountability. The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims.
 

 Lehman also attempts to undermine the class-wide fraud determination by focusing on the reliance element, arguing that the borrowers could not have justifiably relied upon oral misrepresentations when they signed documents that contradicted those oral statements. The argument is that the plaintiffs should have known better than to rely on their loan officers’ misrepresentations, because the fine print in their loan documents told “a different story.” But it was by design that the borrowers did not understand that the loan documents told a different story. The whole scheme was built on inducing borrowers to sign documents without really understanding the terms. As the district court found, “First Alliance borrowers justifiably relied on the representations of the loan officers in light of their experience and knowledge in entering into the loan transaction.” 298 B.R. at 668. We find unpersuasive in this case the defense that plaintiffs should not have relied on statements that were made with the fraudulent intent of inducing reliance.
 

 While the legal standards for class treatment of a fraud action in federal court are governed by federal law, the merits of the Borrowers’ fraud claim are grounded in state law. Therefore, whether or not a borrower’s reliance on misrepresentations was justified in this case depends on California law. To that end, the California Supreme Court has instructed that “a misrepresentation may be the basis of fraud if it was a substantial factor in inducing plaintiff to act and ... it need not be the sole cause of damage.”
 
 Vasquez v. Superior Court of San Joaquin
 
 County, 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 973 n. 9 (1971). First Alliance’s misrepresentations were at least a substantial factor in inducing the plaintiffs to enter loan agreements. We conclude that the district court’s treatment of the fraud claims was both legally and factually sound. The denial of Lehman’s motions for judgment as a matter of law and for new trial was proper.
 

 B. Aiding and Abetting Fraud under California Law
 

 Regarding the substantive elements of aiding and abetting fraud, Lehman again mounts an attack on both legal and factual grounds, arguing that the jury was not properly instructed on the elements of aiding and abetting liability under California law and that Lehman’s actions did not meet the correct standard for imposing such liability. The jury was instructed that in order to be liable for aiding and abetting fraud, Lehman “had to have known of First Alliance’s fraudulent acts ... [and] had knowledge that its actions would assist First Alliance in the commission of the fraud,” and further that Leh
 
 *993
 
 man did in fact provide substantial assistance to First Alliance. Lehman claims legal error in the district court’s refusal to instruct the jury that
 
 specific intent,
 
 rather than mere knowledge, was required. Lehman also claims legal error in the district court’s denial of its motion for judgment as a matter of law. That motion argued that the Borrowers failed to prove substantial assistance. Again, we conclude that the district court properly determined the law and that sufficient evidence supported the verdict.
 

 1. Actual knowledge standard for aiding and abetting under California tort law
 

 Where a party claims that the trial court misstated the elements of a cause of action, the rejection of a proposed jury instruction is reviewed
 
 de novo. See Ostad v. Oregon Health Sciences Univ.,
 
 327 F.3d 876, 883 (9th Cir.2003). Although the California decisions on this subject may not be entirely consistent, we agree with the district court that aiding and abetting liability under California law, as applied by the California state courts, requires a finding of actual knowledge, not specific intent.
 
 See Vestar Dev. II, LLC v. Gen. Dynamics Corp.,
 
 249 F.3d 958, 960 (9th Cir.2001) (instructing that “[w]hen interpreting state law ... a federal court must predict how the highest state court would decide the issue” and that “where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state’s intermediate appellate courts”). Therefore, the jury was properly instructed.
 

 The California Court of Appeal recently had occasion to articulate the proper standard for imposing liability for aiding and abetting a tort. In
 
 Casey v. U.S. Bank National Assn.,
 
 127 Cal.App.4th 1138, 26 Cal.Rptr.3d 401, 405 (2005), the court acknowledged that “California has adopted the common law rule” that “[liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ...
 
 knows
 
 the other’s conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act.” (emphasis added) (quoting
 
 Fiol v. Doellstedt,
 
 50 Cal.App.4th 1318, 58 Cal.Rptr.2d 308, 312 (1996)); see
 
 also River Colony Estates Gen. P’ship v. Bayview Financial Trading Group, Inc.,
 
 287 F.Supp.2d 1213, 1225 (S.D.Cal.2003) (“A party can be liable for aiding and abetting an intentional tort if ... an individual is aware that the other’s conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other to so act.”);
 
 Lomita Land & Water Co. v. Robinson,
 
 154 Cal. 36, 97 P. 10, 15 (1908) (“The words ‘aid and abet’ as thus used have a well-understood meaning, and may fairly be construed to imply an intentional participation with
 
 knowledge
 
 of the object to be attained.”) (emphasis added). The court in
 
 Casey
 
 specified that to satisfy the knowledge prong, the defendant must have “actual knowledge of the specific primary wrong the defendant substantially assisted.” 26 Cal.Rptr.3d at 406.
 
 [4]
 
 We apply this standard to the Borrowers’ claims.
 

 
 *994
 
 2. Lehman’s actual knowledge of First Alliance's fraud
 

 The district court denied Lehman’s motion for judgment as a matter of law, rejecting Lehman’s argument that the evidence was insufficient to establish Lehman’s actual knowledge of First Alliance’s fraud, an argument Lehman pursues on appeal. As noted earlier, denial of judgment as a matter of law is reviewed
 
 de novo,
 
 but the judgment should be reversed only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.
 
 Hangarter,
 
 373 F.3d at 1005;
 
 see also Forrett v. Richardson,
 
 112 F.3d 416, 419 (9th Cir.1997),
 
 cert. denied,
 
 523 U.S. 1049, 118 S.Ct. 1366, 140 L.Ed.2d 515 (1998). While the evidence supporting Lehman’s “actual knowledge” is not overwhelming, deference must be accorded the jury’s factual findings at this stage of review. It cannot be said that no reasonable interpretation of the record would lead to a finding of actual knowledge.
 

 The jury found that Lehman had knowledge of First Alliance’s alleged fraud and had a role in furthering the fraud during the period between 1998 and 2000.
 
 [5]
 
 Among other evidence in the record, the Borrowers highlighted the facts that throughout its investigations into First Alliance, Lehman received reports that detailed the fraudulent practices in which First Alliance was engaged, and that in one report, a Lehman officer noted his concern that if First Alliance “does not change its business practices, it will not survive scrutiny.” That same evaluation recounted that First Alliance “does not have the clear-cut defenses that the management believes” and that “at the very least, this is a violation of the spirit of the Truth in Lending Act.” It was not unreasonable for the jury to rely upon these evaluations in concluding that Lehman had actual knowledge of First Alliance’s fraudulent loan origination procedures. Therefore, Lehman’s request for judgment as a matter of law based on this claim must fail.
 

 3. Lehman’s substantial assistance of First Alliance’s fraudulent lending scheme
 

 Lehman also appeals the denial of its motion for judgment as a matter of law on the ground that plaintiffs failed to prove the second prong of the aiding and abetting test, that Lehman substantially assisted First Alliance’s fraud. We employ the same
 
 de novo
 
 standard of review to this element of Lehman’s motion for judgment as a matter of law as we did to the “actual knowledge” prong,
 
 see Forrett, 112 F.3d
 
 at 419, and we likewise conclude that the jury’s finding that Lehman substantially assisted First Alliance’s fraudulent lending practices should not be disturbed.
 

 As was true of the “actual knowledge” prong of aiding and abetting under California law, the definition of “substantial assistance” under California law is not entirely clear.
 
 See Casey,
 
 26 Cal.Rptr.3d at 405-406 (finding no California cases directly addressing the question of what constitutes substantial assistance). Against such
 
 *995
 
 a backdrop, we again follow
 
 Casey’s
 
 lead in holding that “ ‘ordinary business transactions’ a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort. Knowledge is the crucial element.”
 
 Casey,
 
 26 Cal.Rptr.3d at 406.
 

 It appears that the jury found, as did the district court (298 B.R. at 668), that Lehman satisfied all of First Alliance’s financing needs and, after other investment banks stopped doing business with First Alliance, kept First Alliance in business, knowing that its financial difficulties stemmed directly and indirectly from litigation over its dubious lending practices. That was enough to conclude that Lehman was providing the requisite substantial assistance. Lehman admits that it knowingly provided “significant assistance” to First Alliance’s
 
 business,
 
 but distinguishes that from providing substantial assistance to
 
 fraud.
 
 In a situation where a company’s whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference. The jury was not precluded as a matter of law from finding that Lehman substantially assisted First Alliance in its fraud.
 

 C. California Unfair Competition Law
 

 In addition to their claim of common law aiding and abetting fraud, the Borrowers brought a companion claim against Lehman under California’s UCL, Cal. Bus. & Prof.Code § 17200. The district court granted summary judgment in favor of Lehman on the ground that Lehman did not personally participate in the fraud perpetrated by First Alliance. The Borrowers appeal the court’s grant of summary judgment on this claim, and we affirm, though on different grounds.
 
 See In re Gulino,
 
 779 F.2d 546, 552 (9th Cir.1985) (recognizing that the appellate court can affirm the judgment below on any basis fairly supported by the record). The court of appeals reviews a grant of summary judgment
 
 de novo. United States v. City of Tacoma,
 
 332 F.3d 574, 578 (9th Cir.2003). We must determine whether the district court correctly applied the relevant substantive law.
 
 Roach v. Mail Handlers Benefit Plan,
 
 298 F.3d 847, 849 (9th Cir.2002).
 

 Section 17200 creates a cause of action for an “unlawful, unfair or fraudulent business act or practice.” Its coverage has been described as “sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law.”
 
 Cel-Tech Communs., Inc. v. L.A. Cellular Tel. Co.,
 
 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 560, 973 P.2d 527 (1999) (internal quotation marks and citations omitted). A practice may be “deemed unfair even if not specifically proscribed by some other law.”
 
 Id.
 
 at 561. The statute prohibits wrongful business conduct in whatever context such activity might occur. The standard is intentionally broad and allows courts maximum discretion to prohibit new schemes to defraud.
 
 Searle v. Wyndham Int’l, Inc.,
 
 102 Cal.App.4th 1327, 126 Cal.Rptr.2d 231, 235-36 (2002).
 

 The district court granted summary judgment in favor of Lehman on the ground that “the key to extending liability pursuant to an aiding and abetting theory under section 17200 is the degree to which the alleged aider and abettor participated in and exerted control over the underlying unfair act,” citing
 
 Emery v. Visa International Service Association,
 
 95 Cal.App.4th 952, 116 Cal.Rptr.2d 25, 33 (2002),
 
 People v. Toorney,
 
 157 Cal.App.3d 1, 203 Cal.Rptr. 642, 650-55 (1984), and
 
 People v. Bestline Products, Inc.,
 
 61 Cal.App.3d 879, 132 Cal.Rptr. 767, 792 (1976). The district court
 
 *996
 
 read these cases as narrowing the scope of permissible claims predicated on aiding and abetting liability to those in which a defendant had “personal participation” in and “unbridled control” over the practices found to violate the code. Applying this narrow interpretation, the court found that no issue of triable fact could establish Lehman’s liability under this section.
 

 There is reason to think that the statute is broader than the district court interpreted it to be
 
 [6]
 
 and that it might indeed encompass the Borrowers’ claims against Lehman. The breadth of section 17200’s coverage need not be delineated to decide this issue, however, as the
 
 remedies
 
 available under the statute are narrowly limited and do not include the type of damages the Borrowers seek.
 

 Even if Lehman’s conduct fits within the type identified by the UCL, the Borrowers are not eligible for the remedies available under section 17200, which are limited to forms of equitable relief.
 
 See In re Napster, Inc. Copyright Litigation,
 
 354 F.Supp.2d 1113, 1126 (N.D.Cal.2005) (noting that an unfair competition action is equitable in nature, and thus damages are not available to private plaintiffs). We therefore affirm summary judgment against the Borrowers on their claims under the UCL.
 

 In
 
 Korea Supply Co. v. Lockheed Martin Corp.,
 
 29 Cal.4th 1134, 1152, 131 Cal. Rptr.2d 29, 63 P.3d 937 (2003), the California Supreme Court discussed the available equitable remedies under the UCL, which “allows any consumer to combat unfair competition by seeking an injunction against unfair business practices. Actual direct victims of unfair competition may obtain restitution as well.”
 
 See also Madrid v. Perot Systems Corp., 130
 
 Cal.App.4th 440, 30 Cal.Rptr.3d 210, 218 (2005) (“the UCL limits the remedies available for UCL violations to restitution and in-junctive relief”). In the context of the UCL, “restitution” is meant to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest, and is so limited.
 
 Id.
 
 at 219;
 
 Napster,
 
 354 F.Supp.2d at 1126;
 
 see also Korea Supply,
 
 29 Cal.4th at 1144-45, 131 Cal.Rptr.2d 29, 63 P.3d 937. “[Rjestitu-tionary awards encompass quantifiable sums one person owes to another.”
 
 Cortez v. Purolator Air Filtration Products Co.,
 
 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 529, 999 P.2d 706 (2000).
 

 In
 
 Madrid,
 
 30 Cal.Rptr.3d at 213-16, plaintiff brought a class action suit on behalf of California electricity customers against parties involved in restructuring the state’s electricity market, who allegedly employed fraudulent means to manipulate market prices of electricity. Plaintiff sought “disgorgement of all ill-gotten monies but did not allege the existence of any
 
 *997
 
 ill-gotten monies other than the difference in electricity rates in excess of what customers would have paid in the absence of defendants’ conduct.”
 
 Id.
 
 at 220(internal quotation marks omitted). The
 
 Madrid
 
 court rejected plaintiffs request that defendants be ordered to “simply return to plaintiff exactly what was wrongfully taken, plus any profits made,” explaining that “plaintiff relies on general principles of the law of remedies, e.g., that restitution in the broad sense focuses on the defendant’s unjust enrichment, rather than the plaintiffs loss. Plaintiffs generalization fails to acknowledge the specific limitation applicable in the UCL context — that restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it.”
 
 Id.
 
 at 221.
 
 See also United States v. Sequel Contractors, Inc.,
 
 402 F.Supp.2d 1142, 1156 (C.D.Cal.2005) (holding that plaintiff failed to state a claim for relief under the UCL because it had not alleged any facts supporting a finding that it had an ownership interest in property or funds in the defendant’s possession, and emphasizing that plaintiff sought “the same monetary relief in its UCL claim that it seeks in its breach of contract and negligence claims” which are “damages, not restitution”).
 

 Like the plaintiffs in
 
 Madrid
 
 and
 
 Sequel Contractors,
 
 the Borrowers in this case cast their claim under section 17200 as one for equitable relief by asking the court to disgorge Lehman’s “ill-gotten gains,” asserting that Lehman unlawfully acquired money and property directly and indirectly from the Borrowers and has been unjustly enriched at their expense. They do not, however, specify the amount of these “ill-gotten gains” to which they have an actual ownership interest. Theoretically,
 
 [7]
 
 the money in which the borrowers purport to have an ownership interest is the money that flowed from First Alliance to Lehman, in the form of bundled mortgage payments to repay the capital line, and to the bondholders to whom Lehman sold the mortgage-backed securities. In order to draw the necessary connection between the Borrowers’ ownership interest and these funds, however, the court would have to assume that all of the money that flowed to Lehman pursuant to its relationship with First Alliance was taken directly from the Borrowers and should not have been. There is no reason to believe, nor do the Borrowers argue, that
 
 all
 
 of the money that went to First Alliance was improper. Rather, the basis of the fraud claim against First Alliance, for which Lehman is liable for aiding and abetting and upon which the Borrowers’ UCL claim is based, is that Borrowers were defrauded because of hidden fees and interest rates. Perhaps many class members would not have agreed to any mortgage at all unless they had gotten the terms they believed they had with First Alliance, but there is no basis to conclude that every single dollar that ultimately flowed to Lehman was “ill-gotten.”
 

 The prayer for equitable relief which the Borrowers put forth here is more akin to a claim for “nonrestitutionary disgorgement,” which the California Supreme Court in
 
 Korea Supply
 
 defined to include orders to compel the surrender of all profits earned as a result of unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.
 
 Korea Supply,
 
 131 Cal.Rptr.2d at 38, 63 P.3d 937. Holding that such a remedy is not available under the UCL,
 
 *998
 
 the
 
 Korea Supply
 
 court explained that the “overarching legislative concern was to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition. Because of this objective, the remedies provided are limited.”
 
 Id.
 
 at 43(internal quotation marks and citations omitted);
 
 see also Napster,
 
 354 F.Supp.2d at 1126-27 (following
 
 Korea Supply); Tomlinson v. Indymac Bank, F.S.B.,
 
 359 F.Supp.2d 891, 893 (C.D.Cal.2005);
 
 National Rural Telecomms. Coop. v. DIRECTV, Inc.,
 
 319 F.Supp.2d 1059, 1091 (C.D.Cal.2003). The remedies provided under the UCL do not include the monetary relief Borrowers seek. The district court’s grant of summary judgment in favor of Lehman on the Borrowers’ section 17200 claims is therefore affirmed.
 

 D. Punitive Damages
 

 The district court dispensed with the Borrowers’ attempt to recover punitive damages from Lehman by granting Lehman’s motion for summary judgment on the issue. The Borrowers appeal the order, claiming that the court improperly weighed the evidence, rather than viewing it in the light most favorable to the plaintiffs. Upon
 
 de novo
 
 review, viewing the evidence in the light most favorable to the nonmoving party, we affirm.
 

 Under California law, punitive damages are appropriate where a plaintiff establishes by
 
 clear and convincing evidence
 
 that the defendant is guilty of (1) fraud, (2) oppression or (3) malice. Cal.Civ.Code § 3294(a). According to the definitions provided in section 3294(c), a plaintiff may not recover punitive damages unless the defendant acted with intent or engaged in “despicable conduct.”
 
 [8]
 
 “The adjective ‘despicable’ connotes conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.”
 
 Lackner v. North,
 
 135 Cal.App.4th 1188, 37 Cal.Rptr.3d 863, 881 (2006) (internal quotation marks and citations omitted). While a defendant may be liable for punitive damages based on “despicable” conduct that merely involves a conscious disregard of the rights and safety of others, rather than an affirmative intent to injure, there are “few situations in which claims for punitive damages are predicated on ... conscious disregard of the rights or safety of others and in which no intentional torts are alleged.”
 
 Central Pathology Serv. Med. Clinic, Inc. v. Superior Court,
 
 3 Cal.4th 181, 10 Cal.Rptr.2d 208, 214, 832 P.2d 924 (1992).
 

 The district court found that the Borrowers could not prove any facts that could meet the burden of evidence that Lehman’s conduct amounted to fraud, malice or oppression under California punitive damages law, and we conclude that the district court did not err in making this determination. Some limited weighing of the evidence is a natural component of determining whether a jury could have reasonably found punitive damages appro
 
 *999
 
 priate under the heightened clear and convincing evidence standard.
 
 See, e.g., Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 254-55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that in ruling on a summary judgment motion, the district court takes this heightened evidentiary standard into consideration). Moreover, viewing evidence in a light most favorable to a non-moving party does not require a district court to view
 
 only
 
 evidence that is favorable to the non-moving party.
 
 See id.
 
 at 254, 106 S.Ct. 2505(“There is no genuine issue if the evidence presented ... is of insufficient caliber or quantity to allow a rational finder of fact to find” for the nonmoving party);
 
 see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (“Where the record taken
 
 as a whole
 
 could not lead a rational trier of fact to find for the non-moving party, there is no ‘genuine issue for trial’ ”) (citation omitted) (emphasis added).
 

 The Borrowers presented the court with evidence to support their allegations that Lehman lent First Alliance the financing it needed in order to continue its business, knowing that the business involved fraud. It was up to the court to determine as a matter of law whether this evidence, if proved, could permit a finding of “despicable conduct” that could support an award of punitive damages under the California Civil Code. Lehman’s actual knowledge of First Alliance’s fraud was based on discoveries of questionable lending practices on the part of First Alliance, made during due diligence.
 
 [9]
 
 The diligence effort was a routine analysis and investigation of First Alliance undertaken to determine whether providing financial services to the company made good business sense. That Lehman came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard, but not the intent to injure or despicable conduct that punitive damages requires. Considering the evidence in light of the punitive damages standard, the district court explained that the evidence showed, at best, that Lehman made a series of poor decisions in providing lending and underwriting services to First Alliance. Those decisions ultimately resulted in liability under the Borrowers’ aiding and abetting claim. They did not create a ground on which to award punitive damages. We affirm summary judgment in favor of Lehman against the Borrowers’ claim for punitive damages.
 

 E. Evidentiary Rulings
 

 Lehman claims that during the course of trial, the district court made erroneous evidentiary rulings that prejudiced its rights and provide a basis for the court to set aside the verdict and order a new trial. Evidentiary rulings at trial are reviewed for abuse of discretion.
 
 See United States v. Merino-Balderrama,
 
 146 F.3d 758, 761 (9th Cir.1998). Such rulings will be reversed only if the error more likely than not affected the verdict.
 
 See United States v. Pang,
 
 362 F.3d 1187, 1192
 
 *1000
 
 (9th Cir.2004);
 
 Miller v. Fairchild Indus., Inc.,
 
 885 F.2d 498, 513 (9th Cir.1989). Even where individual evidentiary rulings are considered harmless errors, the “cumulative error” doctrine requires the court to determine whether the cumulative effect of harmless errors was enough to prejudice a party’s substantial rights.
 
 United States v. de Cruz,
 
 82 F.3d 856, 868 (9th Cir.1996). “While a defendant is entitled to a fair trial, he is not entitled to a perfect trial, for there are no perfect trials.”
 
 United States v. Payne,
 
 944 F.2d 1458, 1477 (9th Cir.1991) (internal quotation marks omitted). We see no reversible error in the evidentiary rulings at issue.
 

 The first evidentiary ruling Lehman contests is the admission of testimony at trial from “undisclosed” witnesses. These witnesses included borrowers and First Alliance loan officers who were not specifically identified in the initial disclosures made by the Borrowers pursuant to Federal Rule of Civil Procedure 26(a)(1)(A), and not identified in supplemental disclosures until after the official close of discovery
 
 [10]
 
 (though still more than 60 days before trial began). Rule 26(a)(1)(A) provides that a party must, without awaiting a discovery request, provide to other parties the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims. The Borrowers argue that they complied with pretrial disclosure Rule 26(a)(3) and therefore the disputed witness testimony was properly admitted. Rule 26(a)(3) provides that “[i]n addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to other parties and promptly file with the court the following information regarding the evidence that it may present at trial ... the name and, if not previously provided, the address and telephone number of each witness, separately identifying those whom the party expects to present.” These disclosures must be made at least 30 days prior to trial.
 

 Even if Lehman is correct that the Borrowers should have specifically identified in the discovery disclosures the witnesses ultimately called to testify at trial, it is of little consequence. The complete witness list was provided to Lehman with ample time remaining under Rule 26(a)(3). Moreover, as the district court emphasized, Lehman had knowledge of the identities of the potential witnesses in its possession without disclosure from the Borrowers. Even had it been error for the district court to admit these witnesses, there is nothing to suggest that Lehman was significantly hampered in its ability to prepare for trial or to examine these witnesses. We affirm the district court’s ruling allowing testimony of witnesses not initially disclosed in discovery.
 

 Lehman’s other evidentiary objection is equally unavailing. Prior to trial, the Borrowers obtained an order excluding evidence of First Alliance’s settlement with the FTC. During trial, however, in the course of questioning First Alliance Chairman Brian Chisick, counsel for the Borrowers asked Chisick about the injunction preventing him from ever working in the mortgage lending business again, which was part of First Alliance’s settlement with the FTC. The district court sustained Lehman’s objection to this questioning, but disagreed with Lehman that the reference to the settlement having been made, the door had opened to introduce other evi
 
 *1001
 
 dence pertaining to the settlement, namely the monetary award paid to borrowers by First Alliance. Lehman argues it suffered prejudice as a result of being denied the chance to “tell its side of the story” that borrowers had already received a damages settlement from First Alliance, to “counterbalance the impression that Lehman was the sole source of restitution for Class members.”
 

 Denying the jury this information was not prejudicial error, particularly in light of the fact that the damages settlement
 
 was
 
 fully taken into account, albeit in a different manner. In addition to the in-junctive and monetary components of First Alliance’s settlement with the FTC, a Bar Order was established, which disposed of any further liability on the part of First Alliance for these claims. The Bar Order also limited the liability of other non-settling defendants, including Lehman, to an amount that could fairly be attributed to them alone, because these defendants would be precluded from seeking any contribution or indemnification from First Alliance. The jury was ultimately instructed to apportion Lehman’s liability according to its percentage of fault for the total damages suffered by the Borrowers. Whether the Bar Order was properly applied to limit the damages judgment against Lehman is itself a source of contention in this appeal, which we address below. For the purposes of evaluating any prejudicial impact of excluding evidence of the monetary settlement during the trial, we conclude that any impression that Lehman was the sole source of restitution for class members was sufficiently counterbalanced by the application of the Bar Order. Thus we find no error in the district court’s refusal to grant a new trial based on prejudicial evidentiary rulings.
 

 F. Erroneous Damages Calculation
 

 Aside from the basis for the liability findings, Lehman also takes issue with the damages verdict itself, and a candid assessment of the jury’s calculations justifies Lehman’s objection. Generally, a jury’s award of damages is entitled to great deference, and should be upheld unless it is “clearly not supported by the evidence” or “only based on speculation or guesswork.”
 
 Los Angeles Memorial Coliseum Comm’n v. National Football League,
 
 791 F.2d 1356, 1360(9th Cir.1986) (citations omitted). This, however, appears to be the rare case in which it is sufficiently certain that the jury award was not based on proper consideration of the evidence. Rather, the award was based on
 
 improperly considered
 
 evidence, directly traceable to an error that was cured too little, too late.
 

 The proper measure of damages in fraud actions under California law, as both parties at this point concede, is “out-of-pocket” damages. These are based on what was paid due to the fraud, as compared to what would have been paid absent the fraud. As the California Court of Appeal explained:
 

 There are two measures of damages for fraud: out-of-pocket and benefit-of-the-bargain. The out-of-pocket measure restores a plaintiff to the financial position he enjoyed prior to the fraudulent transaction, awarding the difference in actual value between what the plaintiff gave and what he received. The benefit-of-the-bargain measure places a defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding him the difference in value between what he actually received and what he was fraudulently led to believe he would receive. In fraud cases involving the purchase, sale or exchange of property, the Legislature has expressly provided that the out-of-pock
 
 *1002
 
 et rather than the benefit-of-the-bargain measure of damages should apply.
 

 Fragale v. Faulkner,
 
 110 Cal.App.4th 229, 1 Cal.Rptr.3d 616, 621 (2003) (citing
 
 Alliance Mortgage Co. v. Rothwell,
 
 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601, 609 (1995)) (internal quotation marks and citations omitted).
 
 See also City Solutions, Inc. v. Clear Channel Communications, Inc.,
 
 242 F.Supp.2d 720, 726-32 (N.D.Cal.2003), aff
 
 'd in part & rev’d in part,
 
 365 F.3d 835 (9th Cir.2004).
 

 In this case, the out-of-pocket measure of the Borrowers’ damages meant the difference, if any, between the fees and interest rates that First Alliance charged and those another lender would have charged. If the jury found that a number of plaintiffs would not have refinanced their existing mortgage loans with any lender, absent the alleged fraud, the relevant consideration was the points and fees paid to First Alliance, as compared to plaintiffs’ situations under their existing mortgage loans.
 

 The first set of instructions the jury received, prior to the Borrowers’ closing argument, included a damages instruction that allowed plaintiffs to recover, “[i]n addition to out-of-pocket loss[,] ... any additional damage arising from the transactions, including [but not limited to] amounts actually and reasonably expended in reliance on the fraud.” Such a measure of damages would have entitled the Borrowers to recover the difference between what they paid and what they thought they were paying. The court later recognized, and both parties agreed, that this instruction had been erroneous and that only out-of-pocket damages are recoverable in this type of fraud action.
 
 See City Solutions,
 
 242 F.Supp.2d at 726-32. As a corrective measure, the court re-instructed the jury four days later, after closing arguments and initial submission of the case to the jury. The court asked the jury to “disregard the first reading of the instructions” since there had been “a few agreed upon changes” and “without highlighting what those [we]re” re-read all of the instructions to the jury. The court did not specify which instructions had been altered or corrected.
 

 By the time the jury was re-instructed, the trial had already been conducted by the Borrowers with an eye toward proving damages on a benefit-of-the-bargain basis, to award Borrowers the difference between what they paid and what they thought they were paying. Borrowers offered expert testimony as to how that total would be calculated, suggesting a precise sum based on that theory: $85,906,994. Lehman offered its own expert testimony on the applicable “out-of-pocket” damages calculation, and the expert identified $15,920,862 as the maximum appropriate sum.
 

 Lehman argues — and the district court
 
 agreed
 
 — -that the jury simply averaged the figures provided by the two damages experts. That they did this is beyond doubt: their verdict represents the average of the two figures
 
 to the dollar.
 
 The jury found that the amount of loss was $50,913,928, or exactly half of the sum of the figures provided by each party’s damages expert. As the district court acknowledged, there is “no other plausible explanation” for the amount calculated by the jury. Given that one of the figures used in the averaging was based on an incorrect damages calculation — the number provided by Borrower’s expert witness premised on a “benefit of the bargain” theory — this final award cannot be said to be properly rooted in the evidence at trial.
 

 We recognize that the jury is not bound to accept the bottom line provided by any particular damages expert, but the jury is bound to follow the law.
 
 See Herron v. Southern Pacific Co.,
 
 283 U.S. 91, 95, 51
 
 *1003
 
 S.Ct. 383, 75 L.Ed. 857 (1931) (“It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court”). Having based the damages calculation in substantial part on an improper theory of damages, which the jury most certainly did, the jury did not follow the law according to its instructions.
 

 In denying Lehman’s motion for new trial or remittitur, the district court bent over backwards to find a potentially valid basis in the record for the jury verdict, but that rationale is obviously not tethered to the law or the facts of the case. The court’s denial of Lehman’s motion for new trial or remittitur was an abuse of discretion.
 
 See Koon v. United States,
 
 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (“A district court by definition abuses its discretion when it makes an error of law.”). The judgment must be reversed in part and remanded for further proceedings on the proper calculation of out-of-pocket damages.
 
 [11]
 

 G. Application of FTC Settlement Bar Order
 

 The Borrowers appeal the court’s apportionment of liability in accordance with the Bar Order. The Bar Order, to which we have already alluded, was a component of the court-approved settlement agreement between First Alliance and a national class of borrowers, several states’ attorneys general, the AARP, and the FTC. The settlement agreement created an FTC-administered redress fund to distribute proceeds from the First Alliance estate to First Alliance borrowers and included an injunction barring Lehman (and any other potential non-settling defendants) from seeking indemnification and contribution from First Alliance. Because Lehman’s rights were materially affected, Lehman could have objected to the settlement, but it did not do so because the parties agreed to limit Lehman’s potential liability to its proportional share of responsibility for the Class members’ damages. The settlement thus made indemnification or contribution from First Alliance unnecessary.
 

 The Bar Order specifically states that:
 

 The amount of any verdict or judgment obtained against any of the Non-Settling Defendants in any litigation arising out of or relating to the business of [First Alliance] shall be limited to the Non-Settling Defendants’ proportionate share of liability, i.e., their actual percentage of liability for the amount of total damages determined at trial, in accordance with
 
 [Franklin v.] Kaypro [Corp.,
 
 884 F.2d 1222 (9th Cir.1989)].
 

 The district court enforced the Bar Order by instructing the jury to determine the respective percentages of responsibility as between First Alliance and Lehman. The jury found Lehman to have been responsible for 10 percent of the damages suffered by the Borrowers, and the court entered judgment against Lehman for 10 percent of the total damages found by the jury. The Borrowers filed a Rule 59(e) motion to amend, seeking to overturn the district court’s application of the Bar Order and hold Lehman liable for the totality of the assessed damages. That motion was denied. On appeal the Borrowers maintain that “this case concerns an intentional tort for which only one party was accused, tried and found liable: neither contribution nor indemnity applies.” Therefore, Borrowers insist, application of the Bar Order to reduce the damages judgment against Lehman was error.
 

 
 *1004
 
 The Borrowers find fault with the court’s application of the Bar Order in accordance with
 
 Franklin v. Kaypro Corp.,
 
 884 F.2d 1222, 1231-32 (9th Cir.1989), arguing that the district court’s reliance on
 
 Kaypro
 
 was misplaced. The Borrowers’ argument here is entirely without merit.
 
 [12]
 
 In
 
 Kaypro,
 
 this court concluded under federal common law that a partial pretrial settlement in a securities case, pursuant to which non-settling defendants’ rights to contribution are satisfied and further contribution barred, may be approved under Rule 23 if the liability of non-settling defendants is limited to their actual percentage of liability for the amount of total damages determined at trial.
 
 Id.
 
 at 1231. The court explained that this scheme satisfies the statutory goal of punishing each wrongdoer, the equitable goal of limiting liability to relative culpability, and the policy goal of encouraging settlement.
 
 Id.
 
 Such a scheme also comports with the equitable purpose of contribution, because the non-settling defendants never pay more than they would if all parties had gone to trial.
 
 Id.
 

 The Borrowers attempt to distinguish this case from
 
 Kaypro,
 
 which dealt directly with contribution rather than indemnification. That attempt is misguided, because the district court did not “apply”
 
 Kaypro
 
 as a legal precedent to the facts of this dispute. Rather, the court looked to
 
 Kay-pro
 
 because the settlement agreement so dictated. Under the explicit terms of the Bar Order, the amount of any judgment against non-settling defendants is limited to them proportionate share of liability “in accordance with
 
 Kaypro.” Kaypro
 
 outlined a permissible proportionate liability methodology under Rule 23. The structure it prescribes for apportioning liability was adopted as a contractual agreement by the parties to the settlement. It was the Borrowers who bound themselves through the settlement agreement to the apportionment scheme of
 
 Kaypro.
 
 The district court evaluated the issue correctly, recognizing that in exchange for the Bar Order, Lehman did not challenge the good faith basis of the settlement. Now the class of Borrowers wants to take back the consideration tendered to Lehman in that compromise: the limitation of liability to proportionate fault. The district court saw no reason to do this. Neither do we.
 

 The Borrowers also argue that the principles of contribution and indemnity do not apply to intentional torts under California law. It is true that, as a starting rule, contribution and indemnity are generally not applied to intentional tortfeasors who would shift responsibility onto
 
 negligent
 
 tortfeasors.
 
 See, e.g., Allen v. Sundean,
 
 137 Cal.App.3d 216, 186 Cal.Rptr. 863, 869 (1982). Such a rule does not get the Borrowers very far, however, because the
 
 *1005
 
 present case does not fit into this framework for a number of reasons. First, to the extent that aiding and abetting is an “intentional tort,” it is only intentional in the sense that the aider and abettor intends to take the actions that aid and abet, not that the tortfeasor specifically intends for his actions to result in the fraudulent harm.
 
 [13]
 
 Second, Lehman is not seeking to shift liability to a merely negligent tortfea-sor, but instead to another intentional tort-feasor, First Alliance, which is indisputably the more culpable party.
 

 As the district court concluded, California law does allow for comparative equitable indemnification among
 
 joint intentional
 
 tortfeasors.
 
 Baird v. Jones,
 
 21 Cal.App.4th 684, 27 Cal.Rptr.2d 232 (1993). As the
 
 Baird
 
 court explained, “there is little logic in prohibiting an intentional tortfeasor from forcing another intentional tortfeasor to bear his or her share of liability.”
 
 Id.
 
 at 238. The Borrowers argue that
 
 Baird
 
 is not controlling because it has never been explicitly adopted by the California Supreme Court. While California’s highest court has not ruled on the issue, federal district courts within California have consistently relied on
 
 Baird
 
 to hold that an intentional tortfeasor can seek indemnity from another intentional tortfeasor.
 
 See City of Merced v. R.A. Fields,
 
 997 F.Supp. 1326, 1337 (E.D.Cal.1998);
 
 Don King Prods. v. Ferreira,
 
 950 F.Supp. 286, 290 (E.D.Cal.1996);
 
 Employers Ins. of Wausau v. Musick, Peeler & Garrett,
 
 948 F.Supp. 942, 945 (S.D.Cal.1995).
 
 Band
 
 and its progeny stand on solid policy grounds as well. We do not have before us a situation in which an innocent defendant assumes liability for an intentional wrongdoer. Here, the primary and clearly intentional wrongdoer (First Alliance) has indemnified the secondary wrongdoer (Lehman) from any liability in excess of its fault.
 

 Nor can there be any doubt that Lehman and First Alliance were joint tortfea-sors for the purposes of
 
 Baird
 
 and application of the Bar Order. The Borrowers rely on
 
 Neilson v. Union Bank of California,
 
 290 F.Supp.2d 1101, 1135 (C.D.Cal.2003), in which the court stated that aiders and abettors are not held liable as joint tortfeasors for committing the underlying tort. In that context, the court was making the point that the aider and abettor can be held liable without owing plaintiff the same duty as does the primary violator, a rule vividly illustrated in the present case. Moreover, “[j]oint tortfeasors may act in concert or independently of one another,” and the focus of the inquiry is on “the interrelated nature of the harm done.”
 
 Leko v. Cornerstone Bldg. Inspection Serv.,
 
 86 Cal.App.4th 1109, 103 Cal.Rptr.2d 858, 863 (2001) (citations omitted).
 

 Here, Lehman is clearly being held liable for the same harm for which the class plaintiffs have already obtained some recovery through settlement: the damages claimed were the higher refinancing costs charged by First Alliance, for which First Alliance was liable because it misrepresented the loan terms. Lehman is held liable for the same claimed damages because it provided financial services to First Alliance. The Borrowers’ efforts to charac
 
 *1006
 
 terize Lehman as the “lone intentional tortfeasor” are unavailing. We reject the Borrowers’ request that the court hold Lehman responsible for 100 percent of the damages which the Borrowers themselves went through great pains to prove were caused by someone else.
 

 The Borrowers’ final theory upon which they hope to set aside application of the Bar Order is that apportionment under the settlement was an affirmative defense that Lehman waived by not raising it in the pleadings. This argument is frivolous. The Bar Order itself does not put such a technical burden on non-settling defendants, and there was no possibility for surprise on the part of the Borrowers regarding this claim. Any argument to the contrary is disingenuous, given that the Borrowers were a party to the settlement and were specifically warned by the district court (during discussion on the
 
 in limine
 
 order excluding evidence of the settlement from trial) that any damages award found against Lehman would be apportioned according to the Bar Order. Without having to reach the merits of Lehman’s responsive judicial estoppel claim, we conclude that the district court was correct in holding the Borrowers to the bargain which they made in the settlement.
 

 H. Equitable subordination
 

 Both the Borrowers and the Trustee sought to subordinate Lehman’s secured claims to $77 million in outstanding loan repayments to those of the unsecured creditors in the First Alliance bankruptcy. Under Section 510(c) of the Bankruptcy Code, a court may, based upon equitable considerations, subordinate for purposes of distribution all or a part of a claim or interest to all or part of another. 11 U.S.C. § 510(c). The district court’s decision to grant or deny equitable relief is reviewed for abuse of discretion.
 
 See Grosz-Salomon v. Paul Revere Life Ins. Co.,
 
 237 F.3d 1154, 1163 (9th Cir.2001) (holding that when a district court’s remedy takes the form of an equitable order, the court reviews that order for an abuse of discretion).
 

 The subordination of claims based on equitable considerations generally requires three findings: “(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code.”
 
 Feder v. Lazar (In re Lazar),
 
 83 F.3d 306, 309 (9th Cir.1996) (citing
 
 Benjamin v. Diamond (In re Mobile Steel Co.),
 
 563 F.2d 692, 699-700 (5th Cir.1977)). Where non-insider, non-fiduciary claims are involved, as is the case here, the level of pleading and proof is elevated: gross and egregious conduct will be required before a court will equitably subordinate a claim.
 
 See In re Pacific Express, Inc.
 
 69 B.R. 112, 116 (B.A.P. 9th Cir.1986) (“The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant’s actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity.”) (citing
 
 Matter of Teltronics Servs., Inc.,
 
 29 B.R. 139, 169(Bkrtcy.E.D.N.Y.1983)). Although equitable subordination can apply to an ordinary creditor, the circumstances are “few and far between.”
 
 ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.),
 
 210 B.R. 508, 515 (Bkrtcy.S.D.N.Y.1997) (collecting cases).
 

 
 *1007
 
 The Trustee based his claim to equitable relief on the theory that by aiding and abetting First Alliance’s fraud, Lehman’s actions increased the amount of creditors and claims, thus depleting the pro rata share that each creditor would have of the remaining assets. At first blush, the Trustee’s argument has a certain allure, because there is surely something “inequitable” in an abstract sense about aiding and abetting fraud. Upon closer look, the success of this argument requires us to treat the standard for holding Lehman liable for aiding and abetting First Alliance’s fraud (knowledge and substantial assistance under California tort law) as a stand-in for inequitable conduct under the test for equitable subordination of bankruptcy claims. This we cannot do.
 

 No authority supports the Trustee’s claim that independently tortious conduct is “egregious” as a matter of law. To be sure, courts in other cases have found similar fact patterns to constitute inequitable conduct for the purposes of
 
 Mobile Steel
 
 analysis.
 
 [14]
 
 But nothing dictates that the court’s denial of equitable subordination was an abuse of discretion. The Trustee insists that a “fraud is a fraud, period,” but that is simply not the law, neither in bankruptcy nor in tort.
 
 Cf. In re Mobile Steel,
 
 563 F.2d at 699-700;
 
 Saunders v. Superior Court,
 
 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438, 446 (1994) (outlining the elements of equitable subordination claims and aiding and abetting fraud claims, respectively; defining neither simply as “fraud”).
 

 We agree with the district court that Lehman’s activities were not carried out in contemplation of the later-filed First Alliance bankruptcy, and that Lehman’s conduct was not a contributing factor to bringing about the bankruptcy or determining the ordering of creditors to the bankruptcy estate. Lehman did nothing to improve its status as a creditor at the expense of any other creditor. 298 B.R. at 669. The district court properly found that Lehman’s conduct did not amount to the kind of fraud meant to be remedied by equitable subordination of bankruptcy claims.
 

 Basing its ruling on the lack of inequitable conduct, the district court did not need to reach the question of whether the misconduct resulted in harm to other creditors or conferred an unfair advantage on the claimant, nor do we need to do so in order to resolve this appeal. Still, we agree with the court’s limited findings that:
 

 Lehman’s conduct did not deplete or otherwise adversely impact First Alliance’s assets, nor was Lehman’s conduct related to the acquisition or assertion of its secured claim against the First Alliance estate. Instead, the impact of Lehman’s conduct on First Alliance borrower creditors is only tangentially related to the First Alliance bankruptcy in that both Lehman and the borrowers are creditors of the First Alliance estate.
 

 298 B.R. at 668-669 (internal citations omitted). The district court has discretion to balance the equities of a case pursuant to the Bankruptcy Code, and its exercise of that discretion was proper.
 

 I. Fraudulent Conveyance
 

 The Trustee also looked for relief elsewhere in the Bankruptcy Code and sought to avoid as “fraudulent transfers” about $400 million in payments First Alliance made to Lehman under the Master Repur
 
 *1008
 
 chase Agreement (“MRA”).
 
 [15]
 
 Bankruptcy Code section 548 allows a trustee to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any creditor. 11 U.S.C. § 548(a)(1);
 
 see also
 
 Cal. Civ. Code § 3439.04(a) (incorporating the U.S. Bankruptcy Code). In other words, a “fraudulent transfer” is a transfer of “some property interest with the object or effect of preventing creditors from reaching that interest to satisfy their claims” or “an act which has the effect of improperly placing assets beyond the reach of creditors.” 5 Collier on Bankruptcy P548.04(1) at 548—4, 5 (15th ed. Revised 2002); Witkin, 3 California Procedure (Enforcement of Judgment), 4th ed. § 4451.
 

 The purpose of fraudulent transfer law is “to protect creditors from last-minute diminutions in the pool of assets in which they have interests.”
 
 Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consol. Pioneer Mortg. Entities),
 
 211 B.R. 704, 717 (S.D.Cal.1997). In
 
 Pioneer,
 
 the court faced a scenario not unlike this one, in which a corporation’s liquidating trustee brought an adversary proceeding against the depositary bank, seeking to recover as fraudulent transfers the amount of advances drawn against provisionally credited deposits to commercial accounts that the bank extended to the debtor.
 
 Id.
 
 There, the court had occasion to consider the purpose of this portion of the Bankruptcy Code: “The original fraudulent conveyance statute, in 13 Eliz. ch. 5 (1571), dealt with debtors who transferred property to their relatives, while the debtors themselves sought sanctuary from creditors. The family enjoyed the value of the assets, which the debtor might reclaim if his creditors stopped pursuing him.”
 
 Pioneer,
 
 211 B.R. at 710 n. 5 (citing
 
 Bonded Fin. Servs., Inc. v. European American Bank,
 
 838 F.2d 890, 892 (7th Cir.1988)). The
 
 Pioneer
 
 court held that payment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of their reach. 211 B.R. at 717;
 
 see also Melamed v. Lake County National Bank,
 
 727 F.2d 1399, 1402 (6th Cir.1984).
 

 As it did with the issue of equitable subordination, the district court had discretion over the Trustee’s fraudulent transfer claims, and this Court conducts limited review for abuse of that discretion.
 
 See Grosz-Salomon,
 
 237 F.3d at 1163. We find no such abuse occurred here, and we specifically adopt the finding of the district court that “Repayments of fully secured obligations — where a transfer results in a dollar for dollar reduction in the debtor’s liability — do not hinder, delay, or defraud creditors because the transfers do not put assets otherwise available in a bankruptcy distribution out of their reach.” 298 B.R. at 665. The payments made to Lehman under its agreement with First Alliance were simply not fraudulent transfers within the meaning of the statute.
 

 The Trustee’s argument focuses on First Alliance’s intent to defraud the “borrower creditors,” which he asserts is pri-ma facie evidence of First Alliance’s actual intent to defraud creditors by entering into the MRA with Lehman. In the first place, even though the Trustee refers to them as “borrower creditors,” the borrowers were not creditors at the time of the MRA. Further, there was no defrauding of creditors (or borrowers) by entering into the MRA, with intent or otherwise. The
 
 *1009
 
 district court found that First Alliance perpetrated a fraud by making misrepresentations in the sales pitch for the loans. The MRA had nothing to do with those misrepresentations, and the Trustee’s efforts to conceptually collapse the “obligation incurred” by First Alliance into its fraudulent mortgage loans to borrowers is unconvincing. It is not the case that “the Obligation’s two components are just opposite sides of a single coin,” as the Trustee urges. Rather, “[i]t is important to distinguish between [debtor’s] intent while engaging in the ... scheme to provide funds for the Debtor’s operations and his intent in using those funds so generated to pay the Debtor’s creditors. His intent in generating funds, may not be the same as in spending the funds.”
 
 Barber v. Union Nat’l Bank (In re KZK Livestock, Inc.),
 
 190 B.R. 626, 628 (Bkrtcy.C.D.Ill.1996)
 

 The Trustee is focusing on the wrong transactions. First Alliance’s financing agreement with Lehman
 
 in and of itself
 
 was not fraudulent, nor did it have any impact on the assets available to satisfy bankruptcy claims. The misrepresentations made to borrowers in the course of the mortgage agreements — while constituting a fraudulent scheme — are not the relevant fraudulent scheme for the purposes of this bankruptcy law remedy. Through the fraudulent conveyance mechanism, the Bankruptcy Code contemplates a scheme to hide assets from creditors. Thus, even though the district court found that Lehman substantially assisted First Alliance in fraud, such a finding is not the equivalent of colluding or otherwise participating in a scheme to fraudulently transfer First Alliance assets. Moreover, there is sufficient evidence in the record to support the district court’s conclusion that Lehman actively sought assurances from First Alliance that it would remain financially viable while Lehman provided financing.
 
 See
 
 298 B.R. at 662.
 

 The district court found that Lehman’s commercial relationship with First Alliance constituted aiding and abetting a fraud that led to a class of borrowers who paid too much for their mortgages. Based on these findings, the court held Lehman accountable in damages, a holding we affirm. But if the court granted the equitable relief the Trustee seeks, the effect would be essentially to undo the entire financial relationship that ever existed between Lehman and First Alliance, on top of making Lehman pay damages for it in the first place. Such a result would stretch the facts of this case and the relevant principles of bankruptcy law too far.
 

 III. CONCLUSION
 

 The subprime lending industry was relatively young during the time period in question in this case, and the immense growth of subprime lending over the past decade has prompted efforts by state and federal legislators to create standards that encourage legitimate subprime lending while curbing abusive, predatory practices. Standards for those entities providing financial services to the industry by securi-tizing subprime loans have been similarly undefined. Out of this context the district court was asked to examine the financial relationship between Lehman and First Alliance, in relation to First Alliance’s lending practices, and to apply tort and bankruptcy principles to impose liability for that relationship. We believe the court did so properly.
 

 For the reasons discussed above, we affirm the holdings of the district court imposing liability on Lehman for aiding and abetting a class-wide fraud perpetrated by First Alliance, and rejecting the Borrowers’ claims for relief in the form of equitable and punitive remedies, as well as the Trustee’s claims for equitable relief
 
 *1010
 
 under the Bankruptcy Code. We vacate the damages verdict and remand for further proceedings on the proper calculation of “out-of-pocket” damages caused by First Alliance’s fraudulent lending scheme, to be proportionately attributed to Lehman pursuant to the terms of the Bar Order.
 

 Each party shall bear its own costs.
 

 AFFIRMED IN PART, VACATED IN PART, REMANDED.
 

 [1]
 

 . In 1994 Congress enacted the Home Ownership Equity Preservation Act, 15 U.S.C. § 1639 ("HOEPA”), to combat predatory lending. Some contend that the statute is often and easily circumvented.
 
 See
 
 Tani Davenport,
 
 An American Nightmare: Predatory Lending in the Subprime Home Mortgage Industry,
 
 36 Suffolk U.L.Rev. 531, 547-57 (2003) (discussing state and federal initiatives to reduce predatory lending and increase consumer awareness, but noting the failure of these attempts). Many states have imposed their own laws targeting abusive lending practices on top of the federal regulation, seeking to create stronger consumer protections than the federal law provides.
 
 Id.
 
 Over the past few years the subject of subprime lending has been the topic of several hearings held by the House Committee on Financial Services' Subcommittee on Financial Institutions and Consumer Credit and Subcommittee on Housing and Community Opportunity.
 
 Id.
 

 [2]
 

 . The group of plaintiffs who were party to the settlement agreement included the Federal Trade Commission, several states’ attorneys general, AARP, the Official Joint Borrowers’ Committee (to whom the liquidating trustee Kenneth Henry is the successor in interest), and the class of plaintiffs certified by the court represented by Michael and Barbara Austin and others.
 

 [3]
 

 . For example, the Second and Third Circuits have highlighted the importance of uniformity among misrepresentations made to class members in order to establish that element of fraud on a class-wide basis.
 
 See Moore v. PaineWebber, Inc.,
 
 306 F.3d 1247, 1255 (2d Cir.2002) ("Only if class members received materially uniform misrepresentations can generalized proof be used to establish any element of the fraud.”);
 
 In re LifeUSA Holding, Inc.,
 
 242 F.3d 136, 138-40 (3d Cir.2001) (vacating class certification on appeal where "the gravamen of Plaintiffs’ claims [was] that the Defendant's sales techniques and advertising constituted an allegedly fraudulent scheme” but where the district court had found that the annuity policies were not sold according to uniform sales presentations).
 

 [4]
 

 . We note that as it has been applied, the actual knowledge standard does require more than a vague suspicion of wrongdoing. The
 
 Casey
 
 court itself rejected a trustee's "general allegation that the banks knew the DFJ Fiduciaries were involved in 'wrongful or illegal conduct’ " as a "kitchen sink” allegation that did "not constitute sufficient pleading that the banks had actual knowledge the DFJ Fiduciaries were
 
 misappropriating funds
 
 from DFJ.” 26 Cal.Rptr.3d at 412. Under
 
 Casey’s
 
 approach, Lehman must have known more than that
 
 “something
 
 fishy was going on.”
 
 Id.
 
 at 409. As we explain below, sufficient evidence
 
 *994
 
 of Lehman's actual knowledge of the primary tort supports the jury's verdict.
 

 [5]
 

 . Though the district court held in favor of Lehman following a bench trial on the fraudulent transfer and equitable subordination claims, the court also specifically found that Lehman “knew that First Alliance was engaged in fraudulent practices designed to induce consumers to obtain loans from First Alliance: (1) at the time they funded the warehouse loan on December 30, 1998; (2) after they extended the warehouse loan; and (3) during 1999 and early 2000.” 298 B.R. at 668.
 

 [6]
 

 . In
 
 Toomey,
 
 the issue was whether defendant would be held liable in his personal capacity under section 17200 in addition to liability in his professional capacity as the owner of the company whose practices were found to violate the code. The
 
 Toomey
 
 court specifically noted that liability could be imposed "if the evidence establishes defendant’s participation in the unlawful practices,
 
 either directly
 
 [i.e., through
 
 personal participation
 
 ]
 
 or
 
 by
 
 aiding and abetting
 
 the principal.” 203 Cal.Rptr. at 651 (emphasis added). The
 
 Visa
 
 court made clear that a claim under section 17200 cannot be predicated on vicarious liability, but vicarious liability is not the theory of the Borrowers’ claim here. Furthermore, the
 
 Visa
 
 court found that there was no aiding and abetting on the part of Visa (a critical difference between that case and the one before us), and that there had not even been any injury to the plaintiff. 116 Cal.Rptr.2d at 33.
 
 Bestline
 
 involved a claim under section 17500(which prohibits "untrue or misleading statements,”
 
 see
 
 132 Cal.Rptr. at 771 n. 1), and did not address the minimum requirements for a claim of unfair business practices under section 17200 based on aiding and abetting fraud.
 

 [7]
 

 . As the Borrowers did not actually claim an ownership interest in funds in Lehman's possession, nor explain the basis of their purported ownership interest in those funds, their equitable claim under the UCL is left largely to the court's speculation.
 

 [8]
 

 . Section 3294(c) provides:
 

 As used in this section, the following definitions shall apply:
 

 (1) "Malice” means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
 

 (2) "Oppression” means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person’s rights,
 

 (3)"Fraud” means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.
 

 Cal. Civ. Code § 3294(c).
 

 [9]
 

 . Due diligence, a concept most often employed in the context of securities cases, is generally defined as: "the diligence reasonably expected from, and ordinarily exercised by a person who seeks to satisfy a legal requirement.” Black’s Law Dictionary 468 (7th Ed.1999). As the district court found, Lehman's corporate-level due diligence on First Alliance’s business practices involved looking at whether First Alliance’s corporate structure and business operations provided a sound basis upon which Lehman could provide financial services to the company.
 
 In re First Alliance Mortgage Co.,
 
 298 B.R. at 660. There was no evidence that Lehman's due diligence of First Alliance in early 1999 was not in conformity with Lehman's standard due diligence undertaken in providing financial services to a mortgage lender.
 

 [10]
 

 . This was not the actual close of discovery, as even Lehman subpoenaed a third party witness more than two months into trial, seeking documents pertaining to a 1987 lawsuit against First Alliance.
 

 [11]
 

 . As discussed below, under the Bar Order, the ultimate judgment against Lehman should still represent only 10 percent of the new damages calculation.
 
 See infra
 
 at 1003-06.
 

 [12]
 

 .
 
 The standard of review for the district court’s ruling on the Rule 59(e) motion is the subject of dispute between the parties. Lehman contends that the apportionment of liability was based upon the court’s finding that the Bar Order governed the Borrowers’ claims against Lehman and as such is reviewed for clear error; the Borrowers argue that the district court's decision turned on issues of California law related to equitable indemnity and therefore is not entitled to deference. It is clear from the district court’s order denying the Borrowers' motion to amend the judgment that the decision was based in part on the court's interpretation of equitable indemnification under California law. The standard of review of that order is less clear. Some courts have held that such a motion is reviewed
 
 de novo,
 
 not for an abuse of discretion, when it seeks reconsideration of a question of law.
 
 See, e.g., Pioneer Natural Resources USA, Inc. v. Paper, Allied,
 
 328 F.3d 818, 820 (5th Cir.2003);
 
 Perez v. Volvo Car Corp.,
 
 247 F.3d 303, 318-319 (1st Cir.2001). We need not resolve this question because the district court's application of the Bar Order was proper under either standard.
 

 [13]
 

 . Whether or not aiding and abetting is an "intentional tort” has been a source of contention throughout this case, first with regard to the jury instruction on the elements of the tort (with the Borrowers arguing that aiding and abetting does
 
 not
 
 require specific intent, and carrying the day), and then later with regard to the application of the FTC bar order (with the Borrowers changing course and insisting that the tort is an independent
 
 intentional
 
 tort such that indemnity and contribution cannot apply). The district court’s approach to indemnity and contribution here is consistent with its approach to the jury instructions, and again, we think it is the correct one.
 

 [14]
 

 . Most analogous to the case before us is
 
 In re Granite Partners,
 
 210 B.R. at 515, in which the bankruptcy court found that allegations of aiding and abetting fraud satisfied the pleading requirement for equitable subordination. But satisfying a pleading requirement is not the same as compelling a result as a matter of law.
 

 [15]
 

 . The MRA governed the revolving credit and securitization relationship between First Alliance and Lehman described earlier.
 
 See supra,
 
 section I.B.